Leonard Cephus Hall and Verna G. Hall v. Commissioner. Emma Jane Hall, Surviving Wife of Clayton J. Hall v. Commissioner.
Hall v. Commissioner
Docket Nos. 40203, 40204.
United States Tax Court
1953 Tax Ct. Memo LEXIS 108; 12 T.C.M. (CCH) 1067; T.C.M. (RIA) 53314; September 22, 1953
*108 Petitioners, L. C. Hall and C. J. Hall, sometimes in partnership and sometimes individually, operated a so-called numbers business from 1939 to 1951. Each day they collected from their pick-up men players' tickets and the net amounts bet after the deduction of commissions for the services of such pick-up men and writers. Individual players' tickets were retained for one week. L. C. Hall sent to his accountant a weekly summary of his net intake, amounts paid out in wins, and expenses from which a permanent record was made. Individual tickets were then destroyed. Petitioners' income tax returns were prepared from the permanent records. Respondent accepted as correct all figures in petitioners' returns except the amount paid out in wins. For this item he substituted an amount equal to one-half of the total bets placed on the assumption that the ratio of wins to total bets of a numbers operator should be 50 per cent. Held, respondent's use of a percentage ratio to determine the amount paid out in wins, in the absence of other evidence, was arbitrary and unjustified; and the deficiencies so determined, and the penalties dependent thereupon, cannot be sustained. W. R. Bentley, Esq., 616 *109 Peters Building, Atlanta, Ga., for the petitioners. Homer F. Benson, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies in income tax and penalties as follows: Year
Deficiency
Penalty
1948
$2,044.80
$102.24
Docket No. 40203:
1949
5,160.78
258.04
1950
5,488.86
319.44
1948
$ 451.04
$ 22.55
Docket No. 40204:
1949
574.48
28.72
1950
1,479.02
73.95
The issues to be determined are: (1) was the taxable income of Leonard Cephus Hall and Clayton J. Hall, deceased, understated in returns filed by or for them for the calendar years 1948, 1949, and 1950; and, if so, (2) was any part of the deficiency resulting therefrom due to negligence or intentional disregard of rules and Regulations so as to permit the assessment of a five per cent negligence penalty under section 293 (a) of the Code. The sum of $45 of the total penalty of $319.44 for the year 1950 in Docket No. 40203 represents a penalty asserted under section 294 (d) (1) (B) of the Code. No issue with respect thereto was raised by the pleadings, and it will be considered under a Rule 50 computation. Findings of Fact Leonard Cephus Hall (hereinafter referred to as petitioner) and Verna G. Hall *110 were husband and wife residing together in Nashville, Tennessee, during the years here in question. They filed joint income tax returns with the collector of internal revenue for the district of Georgia for those years. Clayton J. Hall (hereinafter referred to as Clayton) and Emma Jane Hall were husband and wife during the years here in question. They resided together in Nashville, Tennessee, until Clayton's death on November 15, 1950, after which Emma Jane Hall moved to Austell, Georgia, and purchased a farm where she and her five minor children continue to reside. Clayton and his wife filed joint income tax returns for 1948 and 1949, and Emma Jane filed a joint return for 1950 with the collector of internal revenue for the district of Georgia. The returns of both couples were filed on the cash receipts and disbursements basis. Petitioner operated a lottery of the type commonly known as the "numbers business" from the time he moved to Nashville in 1939 until October 31, 1951. From January 5 until August 29, 1948, and from March 26, 1949, until the date of Clayton's death, the business was conducted as a partnership. At all other times, petitioner operated as a sole proprietor. During *111 the periods in which the business was operated as a partnership, profits were shared on the basis of two-thirds to petitioner and one-third to Clayton. No partnership returns were ever filed. Neither of the brothers' wives participated in, nor had any knowledge of, the business. Petitioner, in operating a numbers business, acted as the "banker". The numbers business is customarily operated as follows: Bets are acepted on numbers of three digits consisting of any combination of numbers from 000 to 999, inclusive. Odds of 500 or 600 to 1 are allowed on bets so placed, i.e., for each penny bet on a winning number, $5 or $6 would be paid. While the winning number can be determined from the results of horse races or total sales on the New York Stock Exchange and other sources, it is generally determined by taking the third digit to the left of the last digit on the right in the total sales of butter, as reported for the day by the Chicago Board of Trade, and the second and third digits left of the last digit on the right in the total sales of eggs for the day and by combining the one digit from the total butter sales with the two digits from the total egg sales to make the three-digit *112 number. For the purpose of writing numbers, small sheets of paper, three inches by three inches, commonly known as tickets, are made out in duplicate. Persons desiring to bet give the number to a "writer". The bettor retains one slip, and the other is turned over to a so-called "pick-up man" for delivery to the banker. Writers and pick-up men are allowed percentages of the amounts bet as compensation for their services. The amounts allowed for such services vary between different cities. Petitioner conducted his business in the above-described manner, using the total sales from the butter and egg market to select the winning number for morning business and the total sales from the New York Stock Exchange to select the winning number for afternoon business. He offered odds of 500 to 1. Writers received 30 per cent of the amount bet. Persons performing this service were unknown to petitioner. He employed six or seven pick-up men who were allowed seven per cent of each bet. Both writers and pick-up men deducted their commissions before turning over the balance of the money to petitioner. This is customary practice in many localities. At the close of each day's operations, petitioner totaled *113 the amount of money received; the amount paid out in winnings, or "hits"; the expenses of operating automobiles used in collecting the money and tickets from the pick-up men; telephone and telegraph expenses; rent and bookkeeping expenses; and the cost of supplies. Original tickets were kept for one week in the event that a person holding a winning number, who had not previously collected, might do so. The tickets were then burned primarily because of petitioner's fear of their discovery and use as evidence in prosecution by Tennessee State authorities, since operation of a numbers business was prohibited by State law. Each Monday morning, petitioner summarized the totals of the daily slips of the previous week. This summary was forwarded to his accountant in Atlanta, Georgia. From this data, the accountant made detailed weekly and monthly tally sheets. Only minor mathematical errors in petitioner's summaries were ever discovered by the accountant. Petitioner retained such tally sheets during the entire 12-year period in which he conducted a numbers business in Nashville. Petitioner's and Clayton's Federal income tax returns were prepared from these tally sheets, which were readily *114 made available to respondent's agents in their investigations. The gross intake, wins, and expenses of the business for the years here in question, as reported on petitioner's returns, were as follows: Gross
Year
Intake
Wins
Expenses
1948
$187,311.29
$164,944.49
$6,611.34
1949
187,406.64
168,087.30
6,448.76
1950
202,082.71
185,702.60
7,906.13
The amount of gross intake, as reported by petitioner, was 63 per cent of the total amount actually bet, 30 per cent and 7 per cent having been retained by the writers and pick-up men, respectively. In 1949 internal revenue agents investigated petitioner's returns for the years 1942 through 1948. During the course of that investigation, one of the agents rode with petitioner on one of his daily rounds of collecting from his pick-up men and saw the amount collected. No suggestion was made to petitioner by the agents that original tickets of individual bettors should be retained. Respondent's investigation resulting in the determination of the deficiencies here in question was begun in 1951, and a jeopardy assessment was made on petitioner in February 1952. The agent who conducted this investigation did not go on a collecting round with petitioner. The respondent *115 determined the deficiencies herein by taking the total intake as reported in petitioner's returns and from that figure determining the total amount of bets actually placed. Respondent then determined that the average amount of wins would be 50 per cent of the total amount bet. Since this resulting figure for all three years was less than the amount of wins which petitioner reported having paid out, the difference was disallowed and the deficiencies herein determined. Respondent's agent investigated other numbers operators in Nashville and Knoxville who had complete records and computed their percentage of hits to total amount bet. A comparison of such percentages with those of petitioner are as follows: Operators
Year
Petitioner *
No. 1 *
No. 2 *
No. 3 *
No. 4 **
No. 5 **
1948
56.56%
61.07%
52.26%
53.71%
1949
57.50%
58.05%
61.09%
53.81%
66.77%
67.28%
1950
59.62%
60.35%
48.80%
71.00%
68.00%
Petitioner maintained no checking account at a bank, but kept money and important papers in a rented lock box. The joint income tax returns filed by or for petitioner and Clayton clearly reflected their income for the years here in question. Opinion RICE, Judge: Section 41 [1] of the Internal Revenue Code *116 provides that a taxpayer's net income shall be computed in accordance with the method of accounting which he regularly employs. But that section also gives to the Commissioner the right to compute a taxpayer's income by any method which, in his opinion, will clearly reflect such income if the taxpayer keeps no books or if those which he does keep do not clearly reflect his income. The nature of petitioner's business here did not require an elaborate bookkeeping system, and the one employed was, in fact, quite simple. The individual tickets, which petitioner received each day from his pick-up men, showed the amount bet by a player and, if the winning number had been *117 "hit", the amount paid out. Petitioner retained these individual-player tickets for one week. Each Monday he prepared a summary of the previous week's net intake and wins paid out, and itemized the modest expenses incident to the operation of the business. This summary was forwarded to his accountant in Atlanta who prepared a permanent record. The individual tickets were then destroyed. The respondent challenges the accuracy of the amounts paid out in wins as reflected by these records. He also contends that the total intake shown therein should equal the total amount bet rather than 63 per cent of that amount. Petitioner received only the 63 per cent figure since the writers and pick-up men deducted their respective 30 and 7 per cent commissions first. Pursuant to the authority of section 41 of the Code, the respondent has determined that the amounts which petitioner paid out in wins were smaller than those shown on the permanent records and the returns. The basis for such determination is his contention that the ratio of hits to total bets of a numbers operator should be 50 per cent. Petitioner's ratio for the three years here in question ranged from 56.56 per cent to 59.62 per cent. *118 Other operators in the Nashville area, according to the testimony of respondent's agent, experienced ratios ranging from 48 per cent to 61.09 per cent during the same period. Respondent does not challenge the accuracy of the amounts recorded as net intake or the amounts shown as operating expenses in petitioner's permanent records. To buttress his assumption that petitioner should have shown a 50 per cent ratio of wins to hits during the years in question, respondent called as an expert witness a man 59 years old, a confessed gambler since he was 16, and a numbers operator in Knoxville, Tennessee, for approximately 3 years. The witness had no formal education, having left school after the second grade. The substance of his testimony was that if a $1 bet were placed on each threedigit number from 000 to 999, and odds of 500 to 1 were offered, the holder of the winning number would receive $500 and the banker would retail $500, thus experiencing a ratio of wins to amounts bet of 50 per cent. He admitted, however, that during the operation of his own numbers business, he had paid out in wins in one day as much as three times the amount bet; on other days the wins had been less than the *119 supposed average. This mathematical hypothesis on which respondent and his expert witness have attempted to establish a 50 per cent ratio for a numbers operator offering odds of 500 to 1, is, at best, little more than imaginary. We think the record amply justifies our conclusion that the respondent's assertion of deficiencies was arbitrary and without authority. See Helvering v. Taylor, 293 U.S. 507 (1935). We are not unmindful, of course, that petitioner could have correctly reported the gross intake and expenses incident to the operation of his business and could have consistently overstated the amount of wins, as respondent apparently thinks was the case. We can also appreciate the respondent's disposition to think that one engaged in a business declared illegal under State law might be more apt to incorrectly report his income than one who earned his livelihood in some manner of which society approved. See Rogers v. Commissioner, 111 Fed. (2d) 987 (C.A. 6, 1940). And we also think respondent's conclusion that a secondary reason for petitioner's destruction of the individual-player tickets was to avoid payment of correct income tax is not wholly unreasonable. But mere suspicion *120 that petitioners' permanent records do not accurately reflect his correct income is not a sufficient reason to permit the respondent to determine deficiencies by applying an arbitrary average percentage to the total amounts of bets placed in order to calculate the amount of wins paid out where permanent records, made from the individual-player tickets exist and show the actual amount so paid out. See Alfred A. Nahman, 21 B.T.A. 121 (1930). We also think that the petitioner's meticulous system of transcribing daily, weekly, and monthly statements of his operations over a 12-year period, albeit he destroyed the original-player tickets, could just as logically support the conclusion that while he has made every effort to prevent the discovery of evidence which would be useful in prosecution under Tennessee law, he has made a studied effort to avoid any intentional violation of Federal income tax laws. The respondent objected at trial to our admission of representative excerpts from petitioner's permanent tally-sheet records. Without question, petitioner should have retained the daily-player tickets. They are the most accurate evidence of his gross intake; they contained information that *121 could have led to the identity of the winner and the amount so won; they offer the most correct information for determining the commissions earned by various pick-up men and writers. And, certainly, one who earns his income from a lawless occupation, possibly as often as not in collaboration with convicted criminals, should make a far greater effort than other taxpayers to keep every record, every scrap of evidence of his financial transactions, to substantiate the correctness of his return to the satisfaction of the Federal tax administrators. But this petitioner's testimony was forthright and his demeanor at the trial, together with his willing cooperation with the respondent's agents, convinces us that his testimony was truthful and his records accurate. The respondent accepted as correct all information contained in petitioner's permanent records except the amounts shown as wins paid out. Since the tally sheets were acceptable evidence to him for his purposes, we think, on this particular record, his objection is unfounded when the identical sheets were offered into evidence by the petitioner. Respondent's agents in an earlier investigation accompanied petitioner on one of his *122 daily rounds; saw the amounts collected from the pick-up men and the tickets turned over to the petitioner. In the investigation leading to the assertion of the deficiencies herein, no agent took such a trip although one presumably could have done so, since the record indicates petitioner cooperated fully with the investigators. Since the petitioners' returns clearly reflected their income from the years here in question, the penalties asserted under section 293 (a) of the Code; of course, may not be assessed. Decision will be entered under Rule 50. Footnotes
*. Pay-off odds 500-1. ↩
**. Pay-off odds 600-1.↩
1. SEC. 41. GENERAL RULE. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *↩